Good morning. My name is Ann Trom and I represent Mr. Ernest Wilmore. I just wanted to alert the court that I did file a 28-J letter on June 4th and I've given that to the clerk today. And I also want to reserve at least a minute for rebuttal. I'll keep my eye on the clock. Keep your eye on the clock. Thank you. Mr. Wilmore's Sixth Amendment right was violated because the district court prohibited him from cross-examining the possibly perjured testimony of the government's witness, Robin John. The sole issue at trial was whether Mr. Wilmore possessed a gun on the day that he was arrested. The only direct evidence that he did possess a gun came from Robin John and more specifically, it came in her grand jury testimony. At trial, Ms. John testified that she never saw Mr. Wilmore with a gun and she never saw him wearing a red jacket in which the gun was found. As expected, the government impeached John using her grand jury testimony. And this came as no surprise to the court or to the government because the government warned the court at the outset of the trial that he expected Ms. John to disavow her grand jury testimony and expected to impeach her with it. But the district court had some knowledge that she was going to recant, right? Yes. Was it told in advance, was the district court told in advance that she would take five? He wasn't told that he, wasn't specifically told that she would take the Fifth Amendment, but he was, but the government did say she's going to disavow her grand jury testimony and a week when he, when the government learned this, a week before the trial, he made sure that she had appointed counsel. Now, the only reason really to have appointed counsel in that situation is to advise her on taking the Fifth. But the district court then said, well, you know, we'll just see what happens. He made no inquiry into what the contours of the testimony would be and what the contours of her grand jury testimony would be and whether she would assert. He made no inquiry on that. There's no Ninth Circuit case one way or the other on this point, is there? Well, I think that there's There's no Ninth Circuit case that says this is okay. There's no Ninth Circuit case that says that you have to do it this way or not at all. The government cited a case which says that there's no requirement to have an evidentiary hearing. And I think that that, the name of that case I've probably gotten ahead of myself. It starts with, I think it's Clinger. And in Clinger, which is a case that says you don't have to have an evidentiary hearing, there was at least in that case a colloquy, a detailed colloquy with counsel about basically what was going to happen. Here's what my question is directed to, and please listen in, and then you can answer to your desire when I'm finished with the question. Sure. Okay? Sorry. There's no Ninth Circuit case that says there's an absolute black letter rule that if a district judge has any indication that a witness is going to take the Fifth Amendment on the stand, that that be cleared up in advance before the trial starts. I think that's correct. There's no black letter on that. Is that the rule you'd like to have us write? I actually am not sure that it's necessary to have that rule, because the rule you'd like us to write. I think the rule should be that when, if there's any indication that a witness is going to invoke her Fifth Amendment right on a non-collateral issue, that the district court should explore that prior to trial. Prior to her testimony, in order to decide whether to or at least prior to her testimony and outside the hearing of the jury. Correct. And if we establish that rule, your client prevails. Correct. That rule may be, you know, here the district court had notice, more notice than often is the case, because sometimes this kind of thing may come as a complete surprise. So the district court was going to recant and have no notice except inferentially that she'd take the Fifth Amendment. Correct. But she did have counsel there for that very purpose. The rule would be where there's, where it's reasonably anticipated that a witness might take the Fifth, is that the rule you'd have us write? Yeah. I think that would be, that would be an easy rule to administer for the district court. And in fact, it would insulate them from this kind of problem. And that's, that's this case up or down, isn't it? Yes. Okay. Why don't you sit down and let's hear from the government. I'll do that. You can come back with, you'll have about five minutes to tell us anything you want. Okay. Thank you. Counsel? Good morning. William Reed for the United States. Can you speak up just a little bit? Yes, sir. Thank you. Your Honor, your Honors, in this case, government counsel. First of all, do you agree with your opponent that if we adopt that rule, it's a reversal? If we don't, it's an affirm. I respectfully disagree with that assessment, your Honor. Even if the rule was adopted, in this case, Ms. John, she did invoke her Fifth Amendment right only after the district court intervened. And the government's position is that. How do you suppose the district court appointed counsel? Your Honor, the government, the district court actually did not appoint counsel. The government, once we became aware that Ms. John was potentially going to disavow her testimony, made an effort to have an attorney appointed on her behalf outside the involvement of the district court, your Honor, actually. Well, the district court wasn't involved in the appointment of counsel? No, your Honor. Who appointed the counsel? The FPD? No, your Honor. I actually contacted the CJA attorney in our office or at our court and had that done outside the involvement of the district court. Tell us what the district court knew prior to the time that this witness testified. Your Honor, I advised the district court that Ms. John had testified before the Tuesday trial, actually, and that we became aware at that time that Ms. John potentially was going to recant her testimony or her grand jury testimony, and that we had had counsel appointed on her behalf. Her trial, her counsel was present there in the district court courtroom. So the district court knew before she took the stand that she had testified under oath that she saw the defendant with the weapon. I don't know if I was that specific. I think I was more general that she was going to disavow her. She wasn't going to recant about what time of day this took place or some other issue like that, was she? She told you in the pre-trial interview that for whatever reason, if she took the stand at trial, she was going to recant what she had said before the grand jury, right? That's correct, your Honor. That testimony before the grand jury was sworn. Yes, your Honor. So if she's going to get on the stand at the trial and say, no gun, that's directly contradictory of what she said before the grand jury, right? Yes, your Honor. Okay. And the district court knew what I've just described. To borrow from your vocabulary, inferentially, I suppose, your Honor, I did not spell it out in those exact terms, but that she was potentially at peril. I think I told the district court because she was going to recant her sworn testimony. Would you agree, whether it's a rule that binds this case or not, that it would have been better practice to deal with this issue before she took the stand? I would agree with that. Say to this witness, if you have any anticipation you're going to take the Fifth Amendment, I don't allow partial invocations in my courtroom. You either take it or you don't. I would agree, but I would also – And then if she hadn't appeared, would you have been able to use the grand jury testimony in the trial? I think that would have been – The answer is yes, isn't it? Yes, your Honor. Tell us what the practical problems would be from a U.S. attorney's point of view of adopting a rule that says this kind of problem has to be dealt with prior to trial. It's – with witnesses who are volatile, it's never a situation where you can look, as the district judge said, in a crystal ball and anticipate exactly what their testimony may or may not be at trial. We certainly – the district court had discretion. Who called this witness? The government did, your Honor. Whoever calls a witness that might anticipate taking the Fifth Amendment, what is wrong with the district court prior to trial saying, if you have any anticipation you're going to take the Fifth, I want to know about it before you take the stand out of the presence of the jury, and I don't allow partial invocations in my courtroom? What's wrong with that? There's nothing wrong with it, your Honor. I would suggest that it's still within – as the case law at the time was, that the district court had the discretion to handle this matter as it saw fit at the time of the trial. Well, as long as there's not a hard-and-fast rule, wouldn't you agree that this potential problem can occur again?   I would also like to argue that even if this was error, certainly in the totality of all the testimony at trial and the evidence, the government would argue there would have been harmless error in this case. The witness, her testimony, which a defendant complains of here today, it's the government's position that that was a collateral aspect of her entire testimony. Well, you had the DNA evidence on the jacket. You also found a cell phone with Ms. John's number on it, and the gun was in the pocket. But let me ask you on this business of harmless error, assuming the Crawford case now is – would control here – and I'm not saying it does, but just assume that it does – and that there was a denial of the right of confrontation, isn't that structural error? Your Honor, I respectfully would disagree that it's structural error that even if there was a denial of the confrontation right, the court has a prerogative of analyzing that in the context of harmless error, and in this case with, as the evidence, as Your Honor has alluded to. Why wouldn't it be structural? In other words, if I am denied the right of confrontation, now, under Crawford, it's very strong. The Owens case is out the window. You now come out and say that the right of confrontation is really what the history of the constitutional provision provides. And if that's a violation of the Constitution, why isn't that structural? Your Honor, my response – Of course, I'm asking that because if it is structural, then the harmless error rule wouldn't apply. Yes, Your Honor. My response would be, in the Crawford case, there is a footnote where the Supreme Court used words to the effect that they had no position as to whether or not – I believe it's the state of Washington Supreme Court's determination that the violation of the confrontation clause in that case was not harmless error. So it's the government's interpretation and position that, by implication, the Supreme Court leaves that for this Court's future determination as to whether or not it can be reviewed under a harmless error standard. That would be my response. And I believe there are also a number of other cases that the Supreme Court has decided where confrontation clause abrogations have been previously reviewed under a harmless error standard. I don't understand the sequence in this case. She takes the stand, she testifies, and her testimony is that she didn't see the gun. This is at trial. Yes, sir. And the government is allowed to impeach her by saying, didn't you testify differently in front of the grand jury? Yes, sir. And then when you get to the question, well, which one is true, that's it. It's cut off. Yes, sir. The district court intervened. Do you think of – you know, it's not uncommon for witnesses to have said under oath or otherwise different things at different times. Is there anything more fundamental to cross-examination than being able to ask a witness whether one of two sworn testimonies is the truth? Your Honor, the government acknowledges that certainly is a critical and important And you got to ask that question. The government did. Without a response. That was not – the district court intervened and she was not allowed to respond. I would also ask And she was not allowed to be cross-examined any further by the defense. Your Honor, in the record, the defense did certainly cross-examine her. She did deny that the defense actually showed her the firearm and showed her the red coat where the DNA was found. And in the middle of the trial and asked her if she'd seen those before, she unequivocally said no. So she certainly was cross-examined from the government. Was the defense allowed to explore why she had changed her testimony? They were not allowed to go into that collateral issue, Your Honor. They certainly were able to cross-examine her extensively. The defense counsel About her grand jury testimony? Not specifically about what she had said to the grand jury, but indirectly about the crux of the case, the firearm and the coat where the DNA came from. So what the jury then heard was that on direct, I'm sorry, from her own lips, they heard that he did not own the gun, the coat was not his. That's right. And then they also heard, then you offer her impeachment testimony from the grand jury. At that point, she then takes the fifth. But from her own lips, what the jury has heard is the gun's not his, the coat's not his. Yes, sir, that's correct, both in direct and in cross-examination. And then the evidence on which you would demonstrate that the coat was his was DNA evidence found in the pocket of the coat, cell phone found in the coat that has her number listed as wife. Is that correct? Yes, Your Honor. Is there any other evidence connecting him to the coat? He was physically adjacent to the coat. When the officers knocked on the door and the door opened, they saw him very close to the coat, didn't they? I believe the testimony was at arm's length, Your Honor, within arm's reach. And no evidence as to anybody else who had ever seen him with the coat or when the coat was purchased or? No, Your Honor. There was nothing to that effect. Ms. John, the witness who is at issue here, in her cross-examination, there was some testimony about the size of the coat, and she was asking cross-examination about what size coat she wore, and I believe her testimony was XXL, which was the testimony at trial. This was a XXL coat. It was arguably inferred that this perhaps was her coat, and I think that there was argument by the defense counsel to the jury that she certainly would have been a likely target for prosecution, I think were the words. Okay. Thank you for your argument. Our questions took you a bit over your time. Thank you very much. Thank you. Ms. True? The government has repeatedly characterized this as a collateral issue. I don't think that our inability to cross-examine Ms. John and her grand jury testimony was collateral because, again, that was the only direct evidence that someone actually saw him with the gun. We don't contest that there is circumstantial evidence, but, you know, that sort of goes back to the standard of review, which Judge Lay was commenting on. One, I think this probably is structural error because it's such a fundamental denial of the right to cross-examine. But the jury heard both versions, right? They hear both versions, but they don't hear any explanation of sort of the $24,000 question is, what made you tell that to the grand jury? That's what our theory is. She lied to the grand jury, and she had a motivation to lie to the grand jury. And the cross-examination, which we would have wanted to explore, is, look, you said you were upset when you were at the grand jury. You had just met with the prosecution. You had just gone to jail, hadn't you? You had just gone to jail for drugs. You thought you would benefit if you testified against your husband in front of the grand jury, didn't you? We don't get to do that. I mean, we wouldn't have gotten to do it, possibly, because she would have been vote. But, I mean, that line of testimony is very important to assessing the reliability of that grand jury testimony. And that is a key issue in this case. And also just, you know, that's our right to cross-examine, to test the reliability of that testimony. Well, the Court, however, simply restricted the one question as to whether that was truthful before the grand jury or truthful at another time. And I didn't read the record to say that you were restricted from cross-examining on the basis of the grand jury testimony. Well, I did read the record that way. I think if you look, the scope of the Court's order is on the basis of the grand jury testimony. And I think that's the case. I sat through the trial. Well, didn't you do the Court ever say you can't cross-examine on the basis of the grand jury testimony itself? Yes, I think it did. Can you tell us where? Yes. I would. Well, first of all, at page, I think the Court initially said, I'm not sure the extent to which you will be able to cross-examine. Then on page 93, and the government cites this in its brief. Is it ER-93? ER-93. The Court. Hang on just a second. Let's find it. Sure. Sure. Okay. Go ahead. On that page, on ER-93, the Court says, tells defense counsel to avoid asking a question, quote, a question where you know she's going to take the Fifth Amendment. So first, we're not supposed to ask questions where she's going to assert, to invoke. And then at 95, there's a the Court says that he's limits, he's going to limit the scope of cross-examination up until the time where the exchange of the transcripts come where she's impeached with her grand jury testimony. So that basically means that the grand jury testimony is off-limits. The jury saw the grand jury testimony. The jury heard the grand jury testimony, correct. And you couldn't, you read that to say that you couldn't impeach her by saying, isn't it a fact that this is what she said before the grand jury, ABC? And I don't read the record to say that you couldn't ask such a question. I read the record to say that the test for whether we ask a question is, is she going to invoke, that we are supposed to steer clear of the questions where she's going to invoke and where we know she's going to invoke. And that question would be an obvious answer where she would, she would invoke if she were advised. Well, she invoked it as to the question, which is true, your grand jury testimony or testimony here today, correct? Correct. That's a perfectly appropriate invocation of the Fifth Amendment for this particular witness. But is there any indication in the record where you attempted to examine, tell us why you testified the way you did at the grand jury? Why would that necessarily involve the Fifth? That question was, we maintain that that was precluded by the court's order up until the time of the transcripts. After that, don't ask it. And that, it's up until the time of that exchange with the transcripts. Also, just getting back to the error. Even if this is not structural error, the test is not just mere harmlessness, but it's harmless beyond a reasonable doubt. And it's the government's burden to prove that. And the test, this Court has said in Vargas, is it's not whether they could prove their case without this witness, but whether this witness's testimony contributed to the verdict. I don't think there's any way that you can look at this trial and say that this witness's testimony, which is the only direct evidence that someone saw him with the gun, didn't contribute to this verdict. You don't think the jury could have disbelieved her testimony entirely and still convicted? I think it's very hard to, almost impossible to extract that from looking at this record, because I think her testimony was very important. And the government emphasized that it was. All right. Thank you. I thank both sides for their argument. The case just argued will be submitted for decision. And we'll proceed to the next case on the calendar, which is United States against Dunbar. If counsel are present, if they would come forward, please. Thank you.
judges: Lay , Hawkins, Bybee